LESSEE OF THE CITY OF CINCINNATI v. COMMISSIONERS OF HAMILTON COUNTY.

A special verdict finds a dedication of grounds for public uses, made by proprietors, laying out a town where no county was established, and that the county, when organized, came into possession of the dedicated grounds, and occupied them for a court-house and jail, with the consent of the people of the town; and further finds: "That in so occupying said property, it was strictly in accordance with the object had in view by the original donors," it is a finding of the right in the county.

THIS is an ejectment reserved in the county of Hamilton. The object of the action was to recover the possession of a certain piece of ground, situated in the city of Cincinnati, bounded on the east by Main street, on the north by Fifth street, on the west by Walnut street, and on the south by an alley, running from Walnut to Main street.

Upon the trial of the case at the May term of this court, 1835, the jury returned the following special verdict:

"The jury find: 1. That the original proprietors of the town of Cincinnati did dedicate the property in dispute for public uses.

"2. That the county came into the possession, with the consent and approbation of the people of the town, and did occupy it with the consent of the people of the town, up to the time the stone court-house was burnt, in 1813 or 1814.

"3. That in occupying said property, it was strictly in accordance with the objects had in view by the original donors.

"4. That so soon as said property was appropriated to private use, so soon was the object of the original grantors perverted and departed from.

"And if upon these facts, the court is of opinion the law entitles the plaintiff to recover, then we find the defendants guilty. But if, on these facts, the court is of opinion that the law is with the defendants, then we find for the defendants."

B. STORER, for defendants:

A great deal of discussion has been saved by the finding of the jury, and the admissions on the part of the plaintiffs and defendants, that are necessarily involved in the facts stated in the special verdict.

*The right to dedicate, a dedication made, and that such [89 dedication divests the proprietor of all his interest in the estate, is, it seems to us, clearly established. What is the effect of such dedication must always be determined by the purpose for which it was made, qualified or explained, of course, by the situation of the community, and the locality of the place where the grant or appropriation is to be enjoyed.

In the present case the jury have found that the original proprietors of the town of Cincinnati dedicated the property claimed by the plaintiffs to public uses.

2. That the county came into possession with the consent and approbation of the people of the town, and occupied and enjoyed the property, with the consent of the people of the town, up to the time the stone court-house was burned in 1813 or 1814.

3. That in so occupying said property, it was strictly in accordance with the objects had in view by the original donors.

4. That as soon as said property was appropriated to private

uses, so soon was the object of the original grant perverted and departed from.

Upon those facts the court are now asked to decide for whom is the verdict upon principles of law. We insist it is substantially a verdict for the defendants.

In the first place, it must be conceded that if the original proprietors dedicated the property for the use of the defendants, even if the use itself should be perverted, the estate can not revert to the donors. A court of equity can alone correct the evil, and decree that the purpose intended by the dedication shall be substantially pursued.

In the case of Barclay et al. v. Howell's Lessee, 6 Peters, 507, the Supreme Court of the United States say, "if this ground had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery, to compel a specific execution of the trust, by restraining the corporation, or by causing the removal of obstructions. But, even in such a case, the property dedicated would not revert to the original owner. The use would still remain in the public, limited only by the conditions imposed in the grant."

90] The doctrine of the dedication of land to public uses *depends upon the same principles as a grant to an individual; the only difference is, that in the one case no grantee need be named; in the other, it is essential. In both, the act of cession estops the donor or grantor, and he is forever rebutted.

There is no such thing as a conditional dedication, as to title merely; the whole right must pass, as the whole control over the estate is given up by the transfer to those who are to enjoy it. Cincinnati v. White, 6 Peters, 413.

If such is the condition of the original proprietors, let us inquire, in the second place, in what particular is the situation of the present plaintiff made to differ. If the city had the estate, and dedicated it to the county for public purposes, the rule already referred to must certainly hold; for all that can be claimed, in one view of the case, is, that the city sustains such a relation. If the county held by the permission of the city merely, and the right to the property was in the city at the time the occupancy commenced, then the application of the principle we have before stated is manifest.

City of Cincinnati v. Hamilton Co.

But it is found that the occupation, though commenced with the consent of the people of Cincinnati, was in *strict conformity* with the object had in view by the original donors. The occupation being by the county, and for public purposes, it could not have been for the immediate benefit of the city, and the idea that the donation was ever intended to be for the city, is thereby precluded.

We can not imagine that the dedication could be to the city, while the use was secured to the county; nor can we conceive how the city could permit, even if the property was given to her citizens, its exclusive use to be enjoyed by a body in which she had no direct interest or participation.

It is urged, however, that the term public uses must be construed to mean the purposes of the town, or the people of the town. This assumption is predicated upon the opinion of this court, in the case of Brown v. Manning, 6 Ohio, 298. On examining that case, it will be found that the facts were peculiar.

The question was, not to whom, as donees, the property was appropriated, as the donation was proved, and its effect only disputed. A public square was laid out, lots sold, and streets bounded upon it. The dedication was notorious, and acquiesced in by the original donors for several years. They attempted to resume their former estate, and their right to do *so was questioned, [91 in chancery, by one of the purchasers of the lots. It was held that the dedication once made could not be recalled, that the property inured to the public, and was forever lost to the first proprietor.

The court, among other things, decided, in this case, that the term " public square" must mean a square for the benefit of the town, and could not be extended to embrace any other construction. Suppose it is granted, for a moment, that the expression alluded to must be thus limited, how does it affect the present case? Here the jury have found, that the dedication was made for *public purposes*, and that the property was occupied until 1813, in strict accordance *with the intention of the donors*. The term " public purposes " has an extended meaning; it must, to give any effect, be explained by the situation of the projected town, where the dedication is made; and in this view, the use of public ground for a court-house and jail, would seem as consistent with the original intention of the proprietors, as any other public purpose whatever.

Cincinnati was regarded as already the seat of a county, when the dedication was made; and it was natural to reserve for the county an eligible site for the public buildings.

We have thus presented the only point which, it seems to us, is involved in the verdict. If a motion is made for a new trial, it can only be argued at bar, as the evidence adduced at *nisi prius* is voluminous, and can not be embodied, without great difficulty, in the record; besides, the evidence offered on trial has not been noted in the case.

I leave the case, then, with the further remark, that, as it is competent for a chancellor to compel the original donor, if he attempts to resume his estate, to releasd it to the public, that the purposes for which it was granted may be enjoyed; it is only competent, on the other hand, we conceive, as a corollary from the reasoning referred to, for the donor, if his dedication should be perverted by the public, to ask the aid of a court of equity, to restore the uses to their appropriate purposes. No action of ejectment can be brought, as the title is gone forever from the donor.

Reynolds' Lessee *v.* Commissioners Stark Co., 5 Ohio, 204; Smith *v.* Huston, et. al., 6 Ohio, 101.

HAMMOND and WORTHINGTON, for plaintiff:

This is an ejectment, and comes before the court upon a special 92] *finding, by the jury, upon a trial, in Hamilton county. The question is, whether the plaintiff or the defendants are entitled to judgment, on the finding.

It is found as follows:

" We, the jury on our oaths, do find,

" 1. That the original proprietors of the town of Cincinnati did dedicate the property in dispute for public uses."

Let us examine the extent and effect of this finding.

When was the town of Cincinnati laid out? What were the public uses for which the dedication was made?

The finding of the jury being general, resort must be had, for these facts, to public history, and to official records.

It is, we conceive, matter of public history, that the town of Cincinnati was first laid out in the early part of the year 1789. The state of the county, at that time, is also matter of history—its legal condition, in reference to municipal law and municipal jurisprudence. There were no county locations, no county rights, to

which the dedication could possibly refer.   At that time, the whole territory comprehended one county—the county of Washington was proclaimed July 27, 1788.

The county of Hamilton was proclaimed January 2, 1790. Swan's Land Laws, 494.  The dedication for public uses, in general terms, must be understood and interpreted for the public uses of the town.   By reference to the certified copy of the town plat, among the papers, and the explanatory notes accompanying it, the fact appears, that the dedication was made "for public uses," in terms.   The note is in these words:—"The town lots given for public uses are numbered and painted with red ink."

There was then no public use but that of the town.   In Brown *v.* Manning and others, 6 Ohio, 298, this point, we claim, was fully decided.   The doctrine of dedicating town lots for public uses, was elaborately discussed by counsel, and as elaborately considered by the court.   This appears from the numerous authorities referred to by the judge who delivered that opinion.   The result of which clearly is, " that a dedication, in terms, ' public square,' accompanied with private conveyances referring to the public square, is valid, and inures for the benefit ' of the inhabitants of the town.' "

The verdict here finds, that the property in controversy was dedicated " for public uses."   These can only be for the town.   It follows, that the dedication is valid—that the town *was the [93 beneficiary, and must, consequently, have had the original right. Every position taken, by the judge delivering the opinion of the court in Brown *v.* Manning, et al., strongly sustains this dedication, as made for the benefit of the town of Cincinnati.

The second finding of the jury also, sustains this position, incontrovertibly.   It runs thus:

" 2. That the county came into possession with the consent and approbation of the people of the town, and occupied and enjoyed the property with the consent of the people of the town, up to the time the stone court-house was burned, in 1813 or 1814."

Here, the use of the county is expressly referred to the consent of the town.   The occupation, for a jail and court-house, was recognized as a public use by common consent.   There was no assent to aught but a public use, mutual to the town and to the county.   And of this, the jury find:

87 .

" 3. That in so occupying said property it was strictly in accordance with the objects had in view by the original donors."

That is: it was strictly in accordance with the objects of the original donors, that the town should permit the county to occupy the lots granted "for public uses," for the public use of a courthouse and jail. But this permission or consent, of the town, vested the county with no right beyond the legitimate "public use." And so the jury find:

" 4. That as soon as said property was appropriated to private uses, so soon was the object of the original grant perverted and departed from."

The whole finding of the jury is not so full as could be wished. No exception is taken to it by the defendant's counsel, and it plainly concludes the proposition, that, up to the burning of the stone court-house, in 1813 or 1814, the county occupied the ground in question for a court-house and jail. Subsequent to that period the county removed the court-house and jail, and rented the ground upon private leases, reserving rents to the county as landlord. In doing this, the jury find the grant was departed from. Conceding this fact, " the grant was perverted and departed from," what is the legitimate result?

The jury find, that "the object of the original grant [was] perverted and departed from." What " original grant?" It \*matters not whether the departure was from the original grantors to the city, or from the original grantors from the city to the county.

What was the consequence of the departure from this grant? Most certainly it could not invest those who departed from it with a higher estate than they before possessed. Who made the departure? The county. The consequence, then, would seem to be, upon the hypothesis of the counsel for the county, that a forfeiture of the estate was worked. Who can take advantage of that forfeiture? who can make gain or loss by it? Is this the privilege of the original donors, the founders of the city? That is not pretended. The case of Brown *v.* Manning et al., already referred to, is decisive against that. The dedication for " public use " divested the donors of all claim. It invested the donees with title for the legitimately contemplated uses, and these the donees can not forfeit to the original donors. The donees are invested with a trust they can not forfeit. Such is the established doctrine of the American cases, fully recognized and forcibly illustrated in the

City of Cincinnati v. Hamilton Co.

case of Brown v. Manning et al., decided at the last term of this court and already repeatedly noticed. And such is the doctrine of the cases there cited by the counsel on both sides and the judge who delivered the opinion.

The county ceased the public use of the grounds in controversy, removed the public buildings, subdivided the ground, and made permanent leases of it as a private landlord. In doing this, the jury say, "the original grant was perverted and departed from." What is the consequence of this perversion and departure? We say it reinvests the city with possession, to be again disposed of for "public use."

The county has no original right. The right of the city was perfect for public uses, not for private uses. The city yielded a public use to the county. The county "perverted and departed from it." Consequently the city may, nay, is in duty bound, through its official agents, to resume the use and again direct it to its legitimate objects.

The city may assert its rights in an action of ejectment. It is not driven to a bill in chancery. The law invested the county with the naked legal title, subject to the rightful use. See 1 Chase Stat. at Large, 202, sec. 4, of the enactment of Dec. 6, 1800.

*In Cincinnati v. White, 6 Pet. U. S. 431, the Supreme [95 Court of the United States expressly decide, in reference to a different dedication, that of the Cincinnati common, made by these same dedicators, in the same act of dedication, under which the city claims, in this case, that it was not necessary to sue a bill in chancery. That where the right of possession, of use, was in the claimant, under a dedication like this, he could maintain ejectment. This accords with the plainest rules of common honesty and of common sense.

The occupation of the county was neither temporary nor conditional. It was an occupation consistent with a publicly dedicated use, by the permission of the actual cestui que use, who could lawfully permit such occupation. Ceasing to occupy consistently with the use, the permission to occupy could no longer be made obligatory by the cestui que use, if he sought to do so. Did he refuse to take legal measures to resume the possession, chancery, on a proper application, would compel him to take those measures. The true remedy is an ejectment, regarding the permission to occupy as at an end. The case is not one of condition, or of for-

feiture; but of permission in reference to a *public use*. The use, being confessedly disregarded, the permission can not be continued. If the right of the plaintiff to have judgment, on the verdict, is not conclusive, it must result from a defective finding. In that case there should be a *venire de novo*. Enough is disclosed to show that the defendants have no title. It is supposed there is enough before the court to enable them to decide the whole case.

There is no motion for a new trial. No suggestion of such a. motion appears, except in the brief of the defendant's counsel.

Judge HITCHCOCK delivered the opinion of the court:

The finding of the jury in this case is not as full as could have been wished, and it is not, perhaps, improper, according to the suggestion of the plaintiff's counsel, to resort to public history, and to official records to ascertain facts which have not been found by the jury.

The premises in controversy constitute four lots in the city of Cincinnati. Subsequent to the organization of the county of Hamilton, these lots were occupied by the county, for purposes of 96] county buildings, and continued to be so *occupied, until the court-house referred to in the special verdict was burnt. After this accident, the lots were leased to individuals, and the rents were paid to the county. Another fact, which is deemed material, by the plaintiff's counsel, is, that at the time the town of Cincinnati was laid out, there was but one county in the territory now constituting the State of Ohio, to wit: the county of Washington. The county of Hamilton was not proclaimed, until January, 1790—whereas the town of Cincinnati was laid out in 1789.

The jury find, in the first place, that this property was dedicated by the original proprietors of Cincinnati, for public uses. This, if the lands "are used for the object, and in the manner intended by the owner, inures as a grant," 6 Ohio, 303. The original owner is thereby divested of his title, although there is no specific grantee in whom the title can vest. But to avoid any difficulty on this account, provision was made at an early period of our history, by legislative enactment, vesting in the county the fee in lands appropriated by the proprietors of towns for public uses. On December 6, 1800, a law was enacted by the territorial legislature, 1 Chase. Stat. 201, requiring the proprietors of any town that had

theretofore been, or that thereafter should be laid out within the territory, to cause a true and accurate map or plat of such town, to be recorded in the recorder's office of the proper county—and the same law provides, that the fee of any, and all parcels of ground *designated or intended* to be for public uses, should, by such recording be vested "in the county, in which such town is, in trust to and for the uses and purposes therein *named expressed, or intended*, and for no other use or purpose whatever." Upon the recording of the plat of Cincinnati, the fee of the lots in controversy, was vested in the county of Hamilton—not to be disposed of in such a manner as the authorities of the county might deem most expediment and proper, but in trust for the uses "*intended*" by the proprietors of the town.

What were these uses? The jury find "that the county came into possession *with the consent and* approbation of the people of the town, and occupied and enjoyed the property, *with the consent of the people of the town*, up to the time the stone court-house was burned, in 1813 or 1814," and "that in so occupying said property, it was strictly in accordance with the objects had in view by the original donors."

*There is, perhaps, some little difficulty in arriving at a [97 satisfactory conclusion as to the meaning of the jury in this part of the verdict. The inference drawn from it by the counsel for the plaintiff is, that it was in accordance with the object of the original donors, that these lots might be used for the public use of a court-house and jail, provided the people of the town would permit. They argue upon the hypothesis that the use "*intended*" must have been the use of the town; and insist that the finding of the jury, that the property thus used was so used "with the consent of the people of the town," sustains this position. But is this a fair exposition of the verdict or of the intent of the jury? We think not. We understand the jury to say, that these lots were dedicated for public use, for the purpose of erecting thereon a court-house and jail. They had actually been used for this purpose, and the jury find, "it was strictly in accordance with the objects had in view by the original donors." If we are correct in this exposition of the verdict, then it follows, that this property was "intended" for the use of the county, rather than of the town. Counsel insist that such can not be the meaning of the jury, nor could it have been the intention of the donors, because when the

town was laid out there was no other county in the territory than the county of Washington. The fact is correctly stated, but it by no means follows that it could not have been intended that this property should be for the use of a county. The same history to which resort is had to prove this fact, will also show that it was no uncommon thing for the owner of lands, when laying out a town, to appropriate certain lots for the use of a court-house and jail, in anticipation that at some future period a county would be erected of which the town then laid out would be the county seat; and it would have been strange if the proprietors of Cincinnati had not appropriated lots "intended" for this purpose. The verdict of the jury ascertains the fact, that the property in controversy was dedicated for this purpose, and for a time was used for this purpose. Upon the principle of dedication, the right of possession was in the county so long as it was thus used; and from the time of recording the map of the town plat, the fee was vested in the county, in trust for the uses intended by the donors.

The jury next find, " that so soon as said property was appropri-98] ated to private uses, so soon was the object of the *original grant perverted and departed from." Taking this to be the fact and the law, for it seems to be rather matter of law, it by no means follows that the plaintiff has a right of action. In this, as in every other action of ejectment, the plaintiff must recover upon the strength of his own title. He must show a right of possession, at least a better right than the defendant. It will not do for him to rely upon the weakness of his adversary's title, unless he can show some right in himself. In the case before the court, the legal title, the fee of the land, is in the county. Were we to admit that a cestui que trust could maintain ejectment against his trustee, still the lessors of the plaintiff do not sustain that relation to the defendants. This property is not holden by the county for their use, but according to the verdict of the jury, it is holden for the use of the county itself, for the purpose of erecting thereon public buildings. At least it was so holden while those buildings remained; and if since that time it has been otherwise appropriated it is not for the lessor of the plaintiff to complain, for she is not thereby curtailed in any of her rights.

In the opinion of the court, the law arising upon the special verdict is with the defendants, and judgment must be entered accordingly.